IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC., | § | |
| | § | No. 360, 2021 |
| Plaintiff Below, Appellant, | § | |
| | § | Court Below:  Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| SEECUBIC, INC., | § | C.A. No. 2020-0766 |
| | § | |
| Defendant Below, Appellee, | § | |
| | § | |

| | |
|---|---|
| SEECUBIC, INC., | § |
| | § |
| Counterclaimant and Third-Party | § |
| Plaintiff Below, Appellee, | § |
| | § |
| | § |
| v. | § |
| | § |
| STREAM TV NETWORKS, INC., | § |
| | § |
| Counterclaim Defendant Below, | § |
| Appellant, | § |
| | § |
| and | § |
| | § |
| MATHU RAJAN and RAJA RAJAN, | § |
| | § |
| Third-Party Defendants Below, | § |
| Appellants. | § |

Submitted:  April 6, 2022
Decided:  June 15, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery.  **VACATED**, **REVERSED** and **REMANDED**.

Andrew S. Dupre, Esquire (*argued*), Brian R. Lemon, Esquire, Steven P. Wood, Esquire, Sarah E. Delia, Esquire, Stephanie H. Dallaire, Esquire of McCarter & English, LLP, Wilmington, Delaware for Appellants.

Robert S. Saunders, Esquire, Jenness E. Parker, Esquire (*argued*), Bonnie W. David, Esquire, Lilianna Anh P. Townsend, Esquire, Trevor T. Nielson, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. *Of Counsel*: Eben P. Colby, Esquire, Marley Ann Brumme, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Boston, Massachusetts for Appellee.

**VALIHURA**, Justice:

We address whether approval of a corporation's Class B stockholders was required to transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction. Stream TV Network, Inc. ("Stream" or the "Company"), along with Mathu and Raja Rajan,[1] argue that the agreement authorizing the secured creditors to transfer Stream's pledged assets (the "Omnibus Agreement") is invalid because Stream's unambiguous certificate of incorporation (the "Charter") required the approval of Stream's Class B stockholders. Stream's Charter requires a majority vote of Class B stockholders for any "sale, lease or other disposition of all or substantially all of the assets or intellectual property of the company." Stream argues that the court erred by applying a common law insolvency exception to Section 271 in interpreting the Charter, and that the enactment of 8 *Del. C.* § 271 and its predecessor superseded any common law exceptions. It contends that, in any event, such a "board only" common law exception never existed in Delaware.

SeeCubic, Inc. ("SeeCubic") argues that the court correctly found that neither the Charter, nor Section 271, required approval of the Class B shares to effectuate the Omnibus Agreement.

Because we agree that a majority vote of Class B stockholders is required under Stream's charter, we **VACATE** the injunction, **REVERSE** the declaratory judgment, and **REMAND** for further proceedings consistent with this opinion.

---

[1] For simplicity, we refer only to Stream when discussing the positions that Stream and the Rajans have advanced in their briefing. Mathu and Raja Rajan are members of Stream's board of directors, corporate officers, and controlling stockholders.

3

We focus only on the facts relevant to the issue on appeal which is whether the Class B stockholders are entitled to a vote in connection with the transactions contemplated by the Omnibus Agreement.

*A. Stream.*

Stream is a Delaware corporation that was founded in 2009 to develop and commercialize technology that enables viewers to watch three-dimensional content without 3D glasses.[3]  Stream hired engineers to develop Stream's technology, which has been described as promising and revolutionary; however, eleven years after its founding, Stream remained a pre-revenue, development-stage company.

The Rajan family controlled Stream primarily through an investment vehicle owned by Mathu Rajan, his brother Raja Rajan, and their parents.  Together, they hold 19,000,000 Class B shares carrying ten votes per share, giving the Rajans a majority of the Class B common stock and a majority of Stream's outstanding voting power.[4]  The Court of

---

[2] The background facts pertinent to this appeal are drawn primarily from the December 8, 2020 Preliminary Injunction Opinion, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "P.I. Opinion"), the September 23, 2021 Order Granting In Part SeeCubic, Inc's Motion for Summary Judgment, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 4352732 (Del. Ch. Sept. 23, 2021) (the "SJ Order"), the November 10, 2021 Order Entering Partial Final Judgment Under Rule 54(b), *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5240591 (Del. Ch. Nov. 10, 2021) (the "Partial Final Judgment Order"), and the December 8, 2021 Order Denying Stream's Motion to Modify the Injunction, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5816820 (Del. Ch. Dec. 8, 2021),  (the "Modification Opinion").

[3] *Stream TV*, 250 A.3d at 1022.

[4] *Id.*  At the board level, the Rajan brothers historically have controlled Stream.  There were, however, three outside directors on the board at various times.  From approximately 2015 until 2019, Leo Hindery served as an outside director, but he resigned in July 2019 over disputes with the Rajan brothers.  From approximately 2018 until 2019, Mark Coleman served as a second

Chancery observed that "[d]uring its existence, Stream's corporate governance practices have been virtually nonexistent."[5] Stream did not hold annual meetings of stockholders or keep regular minutes of Board meetings.

### B. Stream's Investors.

Since Stream's founding in 2009, Stream raised approximately $160 million from third-party investors in the form of a combination of debt and equity. Stream's senior secured creditor, SLS Holdings VI, LLC ("SLS"), loaned $6 million to Stream through a series of secured notes (the "SLS Notes"). Stream pledged all of its assets, and the assets of its wholly-owned subsidiaries, as security for the SLS Notes and executed a security agreement which authorized SLS to take control of Stream's assets to satisfy the SLS Notes if Stream defaulted.

Stream's junior secured creditor, Hawk Investment Holdings Limited ("Hawk"), loaned Stream more than £50 million, plus $1.336 million, through a series of junior secured notes (the "Hawk Notes"). Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted.

---

outside director but resigned in July 2019 over disputes with the Rajan brothers. From 2011 until 2014, Shad Stastney, the principal of Stream's senior secured creditor, served as an outside director. He rejoined the board in 2019 and served as Chief Financial Officer before resigning on January 30, 2020. *Id*. at 1023. The Rajan brothers also dominated Stream at the officer level. Mathu has served as Stream's Chief Executive Officer since the Company's founding, and Raja served as general counsel and Chief Operating Officer since soon after the Company's founding.

[5] *Id*. at 1023.

## C. Stream's Financial Difficulties.

In 2019, Alistair Crawford ("Crawford"), a stockholder of Stream and the representative of fifty-two of Stream's stockholders (the "Equity Investors"), engaged in discussions with SLS, Hawk, and the Rajan brothers about restructuring Stream. Crawford proposed forming a "NewCo" that would acquire Stream's assets and have a more transparent and investor-friendly governance structure. In December 2019, Crawford provided the Rajan brothers, SLS, and Hawk with a draft of the Omnibus Agreement and other documents to implement the restructuring. The Rajan brothers refused to agree to the restructuring, and the discussions broke down.

In January 2020, the Equity Investors filed a lawsuit in the Court of Chancery against the Rajan brothers. During the same month, Stream missed payroll at least once.

In February 2020, Stream managed to make payroll, but only due to an emergency infusion of capital from Hawk and a short-term loan from another investor. Stream still furloughed numerous employees, and by the end of February 2020, Stream had defaulted on the SLS Notes and Hawk Notes.

On March 9, 2020, SLS notified Stream that Stream was in default.[6] With the Company failing, SLS, Hawk and Crawford urged the Rajan brothers to appoint outside directors. Three days later, on March 12, 2020, the Board was comprised of the Rajan

---

[6] *Id.* at 1024. In addition to the debts that Stream owed its secured creditors, SLS, and Hawk, Stream carried more than $16 million in trade debt and had fallen months behind on payments to customers and suppliers. Stream even failed to make the payments necessary to maintain the patents on its technology. *Id.*

6

brothers and four independent outside directors: Krzystof Kabacinski, Asaf Gola, Kevin Gollop, and Frank Hodgson (collectively, the "Outside Directors").[7]

On March 23, 2020, SLS filed a complaint in Delaware Superior Court against Stream seeking foreclosure and other relief.

## D. The Resolution Committee.

From March 2020 through May 2020, the Outside Directors participated in Board meetings, approved minutes, voted on resolutions, and approved other corporate actions. When the Outside Directors learned of Stream's financial difficulties, they concluded that the only path forward was to negotiate a resolution with the Company's secured creditors and the Equity Investors. In April 2020, the Outside Directors revisited the restructuring discussions with the Rajan brothers. Raja initially participated in the discussions, but his presence generated tension. It became clear that the Outside Directors would have to attempt to broker a resolution.

On May 4, 2020, during a meeting of the Board, Gola proposed three resolutions for consideration. Two of Gola's resolutions, and an alternative to Gola's third resolution, were adopted. Only Gola's second resolution is relevant to the appeal. It proposed the creation of the Resolution Committee with Gola and Gollop as its members. The Resolution Committee would have "the full power and authority of the full Board of

---

[7] In the proceedings before the Court of Chancery, Stream and the Rajan brothers challenged whether the Outside Directors were validly appointed. However, on appeal, Stream does not challenge the Court of Chancery's finding that the Outside Directors were either appointed validly, or in the alternative, that they were *de facto* directors. Therefore, we do not discuss the facts regarding the appointment of the Outside Directors.

7

Directors to resolve any existing or future debt defaults or claims, and any existing or future litigation, or threats thereof, on behalf of [Stream], without further action being required from the Board of Directors or any executive of the [C]ompany."[8] The Rajan brothers abstained from the vote; however, the three directors who voted in favor constituted a majority of a quorum, and the motion carried.

*E. The Omnibus Agreement.*

On May 6, 2020, the Resolution Committee approved the Omnibus Agreement. The parties to the Omnibus Agreement were Stream, SLS, Hawk, and certain Equity Investors.[9]

The Omnibus Agreement provided that Stream would assign its assets to SeeCubic in lieu of SLS and Hawk continuing to pursue foreclosure, and SeeCubic would allow Class A common stockholders to exchange their shares. Specifically, the Omnibus Agreement provided that SLS and Hawk "agreed to stay the [f]oreclosure and satisfy and extinguish each of the SLS Notes and the Hawk Notes in their entirety subject to [Stream] assigning all right, title and interest in and to all assets of [Stream] to a newly-formed holding company [SeeCubic] established by SLS and Hawk, in satisfaction of the SLS Notes and the Hawk Notes."[10] Further, the Omnibus Agreement gave holders of Stream's Class A common stock, other than the Rajan Brothers and their affiliates, the right to exchange their shares of Stream's Class A common stock for an identical number of shares of SeeCubic's

---

[8] *Id.* at 1025 (alternations in original) (quoting Dkt. 101 Ex. 56, at 1057).

[9] Stream's authorized signatories were Gola and Gollop. A150–51 (Omnibus Agreement).

[10] *See* A136 (Omnibus Agreement WHEREAS clause).

common stock at no cost.[11]  The Omnibus Agreement also provided that Stream would receive one million shares of SeeCubic's Class A common stock.[12]

   *F.  The Rajan Brothers' Attempt to Nullify the Omnibus Agreement.*

Soon after the Board created the Resolution Committee, the Rajan brothers attempted to neutralize it.  Initially, the Rajan brothers drafted a written consent of stockholders that purported to remove the Outside Directors.[13]  When that failed, the Rajan brothers developed theories designed to undermine the Resolution Committee, including recruiting Raja's assistant to search for documentation reflecting whether the Outside Directors had accepted their directorships.  Eventually, the Rajan brothers resorted to refusing to comply with the Omnibus Agreement by trying to change who managed certain Stream subsidiaries and attempting to remove prototype technology from a storage facility in the Netherlands.[14]

Once it became clear that the Rajan brothers intended to challenge the Omnibus Agreement's validity, SLS, Hawk, the Equity Investors, and the Resolution Committee attempted to negotiate with the Rajan family to convince them to support the deal.  SLS,

---

[11] *Stream TV*, 250 A.3d at 1025; A139 (Omnibus Agreement § 1.1(d)).

[12] *Stream TV*, 250 A.3d at 1025; A139 (Omnibus Agreement § 1.1(f)).

[13] At the time of the P.I. Opinion, Stream alleged that the May Stockholder Consent (a written consent of stockholders drafted by the Rajan brothers dated May 6) removed the Outside Directors prior to the approval of the Omnibus Agreement, thereby causing the Omnibus Agreement to be invalid.  However, the Court of Chancery concluded that the evidence demonstrated that the Rajan brothers executed the May Stockholder Consent later, and possibly during the evening of May 8 or on May 9, and then backdated the document to May 6 in an effort to preempt the Omnibus Agreement.  *Stream TV*, 250 A.3d at 1026.

[14] Mathu went as far as incorporating a new entity named Glasses-Free Technologies, Inc., and purported to grant it a license to use Stream's technology.  *Id*. at 1027.

9

Hawk, and the Equity Investors offered to amend the Omnibus Agreement to give the Rajan brothers greater consideration, and the Rajan brothers pushed for personal benefits for themselves.[15] Ultimately, the negotiations failed.

G. *Stream Files Suit in The Court of Chancery.*

On September 8, 2020, Stream filed suit and moved for a temporary restraining order ("TRO") to bar SeeCubic from seeking to enforce the Omnibus Agreement. SeeCubic filed counterclaims and third-party claims requesting expedition and a TRO. The court entered a status quo order and scheduled a hearing on the parties' competing motions for preliminary injunctive relief. From there on, "[c]reating litigation chaos seemed to be one of the Rajans' strategies."[16]

1. *The Preliminary Injunction Opinion.*

On December 8, 2020, the court issued the P.I. Opinion, concluding that SeeCubic was entitled to injunctive relief because the Resolution Committee had the authority to bind Stream to the Omnibus Agreement and that the Omnibus Agreement did not require a shareholder vote under Section 271 or the Class Vote Provision in Stream's Charter. The court concluded that "[n]either [Section 271 nor the Class Vote Provision] applie[d] to the transfer of assets contemplated by the Omnibus Agreement."[17] Therefore, the court

---

[15] These personal benefits included employment, compensation, and indemnification for litigation expenses. *Id.*

[16] *Stream TV*, 2021 WL 5816820, at *1. Stream went through two sets of lawyers (at the time of the Injunction Order, Stream was on its third set of lawyers), and the Rajan brothers' represented themselves during portions of the litigation.

[17] *Stream TV*, 250 A.3d at 1033. The P.I. Opinion also concludes that the Outside Directors were appointed validly and that the members of the Resolution Committee did not breach their fiduciary

granted SeeCubic's motion for a preliminary injunction and denied Stream's competing motion.[18]

### a. The Court's Section 271 Analysis at the Preliminary Injunction Stage.

Starting with Section 271 of the DGCL, the court determined that the question before it was "whether the transfer of Stream's assets to its secured creditors under the circumstances presented [] constitute[d] a sale or exchange within the scope of Section 271."[19] To answer this question, the court stated that although the assignment of Stream's assets to SeeCubic could be classified as a "sale" or an "exchange" under Section 271, the better course of action was to "accept that the language of Section 271 is ambiguous as to whether it applies to transactions like the Omnibus Agreement," and look to principles of statutory interpretation.[20] The court then turned to Section 271's legislative history, applied an insolvency exception *sua sponte*, and made three findings.

First, the court found that the common law rule requiring a board to seek unanimous shareholder approval before selling all of the corporation's assets was subject to an

---

duties, therefore, the Court of Chancery did not enter a mandatory injunction. *See id.* at 1028–31, 1045–47. However, these conclusions are not challenged on appeal.

[18] The court concluded that it was reasonably probable that the Omnibus Agreement was a valid and binding agreement, and prohibited Stream, the Rajans, and anyone acting in concert with them, from interfering with SeeCubic's rights under the Omnibus Agreement.

[19] *Id.* at 1033.

[20] *Id.* at 1041. Specifically, the court noted that "Stream does not cite any dictionary definitions, but argues without support that the plain meaning of the terms 'sale' and 'exchange' must encompass the transfer of all Stream's assets to SeeCubic. In light of the [Black's Law Dictionary] definitions [of 'sale' and 'exchange'] . . . that conclusion *is plausible but not mandated*." *Id.* at 1040 (emphasis added).

insolvency exception, thereby allowing boards to transfer all or substantially all of an insolvent company's assets to creditors without shareholder approval.

Second, the court found that the evolution of Section 271's language, mainly the addition of specific acceptable forms of consideration that did not include "forgiveness of debt," supported allowing an insolvent or failing firm to transfer all or substantially all of its assets to creditors.[21]

Third, the court found that, because Section 272 does not require a shareholder vote for the pledging of corporate assets as collateral (unless the corporate charter specifies otherwise), requiring a shareholder vote under Section 271 before a company could otherwise transfer its assets to a creditor "would be contrary to the plain language of Section 272" and against Delaware public policy.[22]

The Court of Chancery explained that, prior to the General Assembly modernizing Delaware's merger statutes, the preferred transaction vehicle involved the target corporation selling all of its assets and then dissolving and distributing the consideration to its stockholders, *i.e.,* asset transfers.[23]  Further, at common law, the general rule was that the directors only have the power of management in conducting ordinary business affairs. This prevented directors from selling the assets of the business without unanimous stockholder approval.  Thus, the objection of a single shareholder could thwart the efforts to sell a corporation's assets.

---

[21] *Id.* at 1042.

[22] *Id.* at 1043.

[23] *Id*. at 1033–34.

However, the court stated that this strict rule was not without exceptions. "A late nineteenth century treatise noted that for 'a failing company the rule is different, and a sale of the whole property may be made by the directors.'"[24] The court cited to two twentieth-century treatises for the same proposition,[25] and noted that even today, a "Delaware treatise acknowledges the 'failing business' exception to the common law rule."[26] The court also cited a Court of Chancery opinion from 1915 that "acknowledged the general prohibition on selling all of a corporation's assets, as well as the exception for an insolvent or failing firm."[27] After reviewing Section 271's statutory predecessor, Section 64a, the court found that "[t]here is no indication that the General Assembly intended to restrict or eliminate authority that already existed at common law, such as the power of the directors of an insolvent and failing corporation to sell its assets."[28]

Against this common law backdrop, the court reviewed Section 271's revisions. "A 1929 amendment confirmed that the consideration could consist 'in whole or in part [of] shares of stock in, and/or other securities of, any other corporation or corporations.'"[29] In 1967, the General Assembly revised the statute again by expanding the expressly permitted

---

[24] *Id.* at 1035 (quoting 1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* § 357, at 582 (1891)).

[25] *Id.* at 1036 (citing Thomas Conyngton & R. J. Bennett, *Corporation Procedure* 232 (rev. ed. 1927); Henry Winthrop Ballantine, *Ballantine on Corporations* § 281 (1946)).

[26] *Id.* (citing 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* §10.7, 10–34 (3d ed. 1998 & 2011 Supp.)).

[27] *Id.* at 1036 (citing *Butler v. New Keystone Copper Co.*, 93 A. 380, 382 (Del. Ch. 1915)).

[28] *Id*. at 1037.

[29] *Id*. at 1037 (alteration in original) (quoting 36 Del. Laws ch. 135 § 19 (1929)).

forms of consideration to include "money or other property."[30]  In addition, the court noted

that the 1967 revision made two related changes to the DGCL:  adding a new provision,

Section 272, and eliminating a provision that did not require either board approval or a

stockholder vote to accomplish a sale of assets to a secured creditor by decree  because that

provision was unnecessary given the rights generally available to secured creditors.[31]

The court observed that, today, Section 271 mandates a "two-step process" that first

requires board approval, and then requires stockholder approval.[32]   Section 271(a)

provides:

> Every corporation may at any meeting of its board of directors or governing
> body sell, lease or exchange all or substantially all of its property and assets,
> including its goodwill and its corporate franchises, upon such terms and
> conditions and for such consideration, which may consist in whole or in part
> of money or other property, including shares of stock in, and/or other
> securities of, any other corporation or corporations, as its board of directors
> or governing body deems expedient and for the best interests of the
> corporation, when and as authorized by a resolution adopted by the holders
> of a majority of the outstanding stock of the corporation entitled to vote
> thereon or, if the corporation is a nonstock corporation, by a majority of the
> members having the right to vote for the election of the members of the
> governing body and any other members entitled to vote thereon under the
> certificate of incorporation or the bylaws of such corporation, at a meeting
> duly called upon at least 20 days' notice.  The notice of the meeting shall
> state that such a resolution will be considered.[33]

---

[30] *Id*. at 1037–38.  The revision added the words "substantially all" as well.

[31] *Id*. at 1038; *see also id.* at 1038 n.18 ("The revisions attempted to eliminate redundant and unnecessary provisions.").

[32] *Id.* at 1039.

[33] 8 *Del. C.* § 271(a).

The court concluded that interpreting Section 271 as requiring a shareholder vote for the type of transaction contemplated by the Omnibus Agreement would create a conflict with Section 272. Section 272 provides:

> The authorization or consent of stockholders to the mortgage or pledge of a corporation's property and assets shall not be necessary, except to the extent that the certificate of incorporation otherwise provides.[34]

In explaining the conflict, the court reasoned that:

> [i]nterpreting Section 271 to require a stockholder vote before an insolvent or failing corporation can transfer its assets to secured creditors would conflict with Section 272 of the DGCL, which authorizes a corporation to mortgage or pledge all of its assets without complying with Section 271. Section 272 is silent as to whether a secured creditor can foreclose on its security interest in the debtor corporation's assets, but the statutory scheme would not function if the debtor corporation had to comply with Section 271 before the creditor could foreclose. When facing the prospect of foreclosure, the board and stockholders of the debtor corporation would have no incentive to approve the transfer of the corporation's assets. As a practical matter, any creditor who wanted to ensure that it had the ability to levy on the pledged collateral would have to obtain a stockholder vote when entering into the credit agreement, contrary to the plain language of Section 272.[35]

The court concluded that Section 271 did not apply to the Omnibus Agreement because Stream was insolvent, its stockholders no longer had a "meaningful interest in the firm," and the secured creditors were entitled to its assets.[36] Therefore, "[u]nder the DGCL, the Omnibus Agreement did not require a stockholder vote."[37]

---

[34] 8 *Del. C.* § 272.

[35] *Stream TV*, 250 A.3d at 1021–22.

[36] *Id.* at 1043.

[37] *Id.*

15

*b. The Court of Chancery Interprets the Charter.*

After analyzing Section 271, the court turned to the Charter's Class B stockholder vote provision (the "Class Vote Provision"). The court found that the language in the Class Vote Provision was "parallel" to Section 271 such that the Charter's language warranted the same interpretation as Section 271.

In full, the Charter's Class Vote Provision provides:

> For so long as shares of Class B Voting Stock remain outstanding, in addition to any other vote or consent required herein or by law, the affirmative vote or written consent of the holders of a majority of the then-outstanding shares of Class B Voting Stock, voting as a separate class, shall be necessary for the Company to consummation [sic] an Acquisition or Asset Transfer.[38]

The Charter defines "Acquisition" as:

> (A) any consolidation, stock exchange or merger of [Stream] with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the stockholders of [Stream] immediately prior to such consolidation, merger or reorganization, continue to hold a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; or

> (B) any transaction or series of related transactions to which [Stream] is a party and in which excess of fifty percent (50%) of [Stream's] voting power is transferred; provided that an Acquisition shall not include

> (x) any consolidation or merger effected exclusively to change the domicile of [Stream], or

> (y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by [Stream] or any successor or

---

[38] A124 (Charter § IV.D.2(d)).

16

indebtedness of [Stream] is cancelled or converted or a combination thereof.[39]

The Charter defines "Asset Transfer" as:

> a sale, lease or other disposition of all or substantially all of the assets or intellectual property of [Stream] or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream].[40]

Although the court did not expressly conclude, at this stage, that the Omnibus Agreement was an "Asset Transfer" as defined under the Charter, the court stated in a footnote that "[t]he Omnibus Agreement involves a transfer of assets, so if any aspect of the Class Vote Provision covered the transaction, it would be the definition of 'Asset Transfer.'"[41] Starting with the definition of "Asset Transfer," the court determined that "[t]he language of the Class Vote Provision track[ed] Section 271 of the DGCL," and therefore resulted in the same outcome: "Stream need not obtain stockholder approval under the Class Vote Provision to transfer mortgaged or pledged assets to the secured creditors who hold security interests in those assets."[42]

---

[39] A126 (Charter § IV.D.4(b)(i)).

[40] A126 (Charter § IV.D.4(b)(ii)).

[41] *Stream TV*, 250 A.3d at 1044 n.24. In contrast, in the court's September 23, 2021 Order Denying The Rajans' Motion to Modify the Preliminary Injunction Under Rule 65, the court states unequivocally that "*The Omnibus Agreement contemplated an Asset Transfer. It provided for Stream to transfer all of assets [sic] in exchange for SLS and Hawk 'stay[ing] the [f]oreclosure [of Stream's assets] and satisfy[ing] and extinguish[ing], in their entirety, the SLS Notes and the Hawk Notes, respectively.'*" *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2021 WL 4352731, at \*2 (Del. Ch. Sept. 23, 2021) (alterations in original) (emphasis added).

[42] *Stream TV*, 250 A.3d at 1043.

Comparing Section 271 and the Class Vote Provision, the court found "only two differences."[43]  First, the Class Vote Provision expressly refers to "intellectual property."[44]  According to the court, the phrase "intellectual property" "does not enlarge the voting obligation beyond the scope of Section 271, because intellectual property is already a type of asset."[45]

Second, the provision refers to "the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream]."  The court acknowledged that the Omnibus Agreement "does not contemplate an exclusive license," but it concluded that the Class Vote Provision's reference to exclusive licenses shows that the drafters "knew how to define the concept of an 'Asset Sale' to include transactions that Section 271 would not otherwise reach."[46]  It then stated that, "[i]f the drafters of the Class Vote Provision wanted to require a class vote before a secured creditor could foreclose on pledged or mortgaged assets, then the definition of 'Asset Sale' should have referred to that type of transaction."[47]  Accordingly, the court concluded that the reference to "a sale, lease or other disposition" in the Asset Transfer definition tracked the language of Section 271 and "warrants the same

---

[43] *Id.* at 1045.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

interpretation."[48]  The court did not separately address whether the Omnibus Agreement fell into the "*other disposition*" category within the definition of Asset Transfer.[49]

Accordingly, the court denied Stream's motion for a preliminary injunction and granted SeeCubic's motion for a preliminary injunction preventing Stream from interfering with the Omnibus Agreement.

### 2. *SeeCubic's Motion for Summary Judgment.*

On January 19, 2021, SeeCubic moved for summary judgment and filed its opening brief.  SeeCubic's motion for summary judgment sought the following relief:  a declaratory judgment that the Omnibus Agreement is valid and binding, a permanent injunction ordering Stream and the Rajans to comply with the Omnibus Agreement, and a judgment against the Rajans for converting the assets identified in the Omnibus Agreement.

Stream filed its answering brief on February 17, 2021, relying exclusively on the briefs it filed in connection with the parties' cross motions seeking preliminary injunctive relief.  Before the parties completed the briefing, Stream and the Rajans filed for

---

[48] *Id*. (citing *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 969 (Del. Ch.), *aff'd,* 567 A.2d 419, 1989 WL 136971 (Del. Oct. 18, 1989) (TABLE)).

[49] In a footnote, the court addressed Stream's "conclusory" claim that the Omnibus Agreement was an Acquisition under the Charter.  According to the court, "[t]he Omnibus Agreement does not contemplate a consolidation or merger, which are specific types of transactions having independent legal significance," and therefore part (A) of the definition of Acquisition did not apply.  *Id*. at 1044 n.24.  The court reasoned that the Omnibus Agreement also did not "result in the transfer of any of Stream's voting power," and therefore part (B) of the definition of Acquisition did not apply.  *Id*.  "By process of elimination" the court determined that "perhaps Stream [thought] the Omnibus Agreement contemplate[d] a 'reorganization.'"  *Id*.  However, the court determined that "Stream would have to provide authorities delineating the content of the term and why it could encompass the Omnibus Agreement" as well as "explain why that concept would trigger a stockholder vote when the definition of 'Asset Transfer' did not."  *Id*.

19

bankruptcy, resulting in an automatic stay of the proceedings before the Court of Chancery.[50] The bankruptcy court dismissed the case as a bad faith filing, and described it as an effort "to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's order, and to maintain ownership and control over the assets of the debtor . . . ."[51]

On September 23, 2021, the Court of Chancery granted, in part, SeeCubic's motion for summary judgment.[52] The SJ Order granted summary judgment in SeeCubic's favor declaring the Omnibus Agreement to be valid and binding. The court also granted SeeCubic's motion for a permanent injunction and converted the preliminary injunction into a permanent injunction. Finally, the court denied SeeCubic's motion as to the conversion claim because the court found that the summary judgment record did not support it.

---

[50] *Stream TV*, 2021 WL 5816820, at *1; A043 (Dkt. 126).

[51] *Stream TV*, 2021 WL 5816820, at *1 (alterations in original); B36–37 (Bankruptcy Ruling at 13–14). On May 27, 2021, after the bankruptcy stay lifted, Mathu Rajan filed a *pro se* letter application claiming that the P.I. Opinion was the product of fraud. *Stream TV*, 2021 WL 5816820, at *1; A048 (Dkt. 138). On June 4, 2021, Mathu filed a formal motion to set aside the P.I. Opinion. *Stream TV*, 2021 WL 5816820, at *1; A049 (Dkt. 143). Then, on September 15, 2021, the Rajans had a third-party seek to intervene and file additional motions. *Stream TV*, 2021 WL 5816820, at *1; A057 (Dkt. 183). The very next day, on September 16, 2021, the Rajans filed another motion to modify the preliminary injunction. *Stream TV*, 2021 WL 5816820, at *1; A058 (Dkt. 185). The court rejected the Rajans' various efforts to set aside the P.I. Opinion, prompting the Court of Chancery's statement that "litigation chaos" seemed to be the Rajans' strategy. *Stream TV*, 2021 WL 5816820, at *1.

[52] *See generally Stream TV*, 2021 WL 4352732 (granting in part SeeCubic's motion for summary judgment as to the validity of the Omnibus Agreement and its request for a permanent injunction).

*3. Stream and the Rajans Move for Partial Final Judgment, Appeal to This Court, and Move to Modify or Stay the Permanent Injunction Pending Appeal.*

On September 28, 2021, Stream and the Rajans moved to have the Court of Chancery enter the SJ Order as a partial final judgment and to stay SeeCubic's conversion claim, which the court granted on November 10, 2021.[53]

On November 12, 2021, Stream and the Rajans noticed this appeal. On the same day, Stream and the Rajans moved to modify or stay the permanent injunction pending appeal. The court denied both requests.[54] The court denied Stream's request to modify the permanent injunction because "[t]here have not been any significant changes in the status quo" since the court entered comparable relief in the form of a preliminary injunction on December 8, 2020.[55] After analyzing the four factors from *Kirpat, Inc. v. Delaware Alcoholic Beverage Control Commission* that guide a trial court's discretion to grant or deny a stay, the court concluded that a stay was unwarranted.[56] In doing so, the Court of Chancery elaborated on its reasoning that Section 271 did not supersede the common law's recognition that directors could sell the assets of an insolvent firm without stockholder approval.

---

[53] *See generally Stream TV*, 2021 WL 5240591 (entering partial final judgment under Rule 54(b)).

[54] *See Stream TV*, 2021 WL 5816820, at *2.

[55] *Id.*

[56] *Id.* at *15. This Court identified the four factors in *Kirpat, Inc. v. Delaware Alcoholic Beverage Control Comm'n*, 741 A.2d 356 (Del. 1998).

*H. The Parties' Contentions on Appeal.*

Stream raises four arguments on appeal. First, it contends that the Class Vote Provision unambiguously requires Class B stockholder approval and renders Section 271's default voting rule irrelevant. Second, Stream contends that the Court of Chancery erred by looking first to Section 271 prior to construing the Charter. Stream further asserts that the court bypassed the Charter's plain terms in order to apply a "board only" common law insolvency exception to Section 271. Third, Stream contends that Section 271 superseded any such common law exceptions assuming, *arguendo*, that such an exception did exist. Finally, Stream argues that the ruling, as a matter of public policy, would upset Delaware's contractarian focus and the predictable application of Section 271.

## II.    STANDARD OF REVIEW

This matter involves the interpretation of both a charter provision and a statute. "The construction or interpretation of a corporate certificate or by-law is a question of law subject to *de novo* review by this Court."[57] "Certificates of incorporation are regarded as contracts between the shareholders and the corporation, and are judicially interpreted as such."[58] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[59] "Statutory interpretation is a question of law, which we review *de novo*."[60]

---

[57] *Centaur Partners, IV v. National Intergroup, Inc.*, 582 A.2d 923, 926 (Del. 1990).

[58] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[59] *Id.*

[60] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 112 (Del. 2020) (citing *Corvel Corp. v. Homeland Ins. Co. of N.Y.*, 112 A.3d 863, 868 (Del. 2015)).

*III.    ANALYSIS*

First, we consider whether the Class Vote Provision requires Class B majority stockholder approval of the Omnibus Agreement.  Stream argues that the Court of Chancery analyzed the issue "upside down" by applying its interpretation of Section 271 to a clear and unambiguous charter provision.  Instead, Stream contends, the plain text of the Class Vote Provision controls and Section 271's default rules are irrelevant.[61]  We agree and explain our reasoning below.

In assessing corporate action for legal compliance, the DGCL does outrank a corporation's charter such that a charter provision is invalid if it conflicts with a provision of the DGCL.  As we recognized in *Salzberg v. Sciabacucchi*,[62] Section 102(b)(1) governs the scope of corporate charters, and its scope is "broadly enabling."[63]  But Section 102(b)'s broad authorization "is constrained by the phrase, 'if such provisions are not contrary to the laws of this State.'"[64]  We stated further that:

> in *Sterling v. Mayflower Hotel Corp.*, this Court held that Section 102(b)(1) bars only charter provisions that would "achieve a result forbidden by settled rules of public policy."  Accordingly, "the stockholders of a Delaware corporation may by contract embody in the [certificate of incorporation] a provision departing from the rules of the common law, *provided that it does*

---

[61] To be clear, Stream argued below that "[e]ven if [the] Charter's approval procedures do not govern, the Omnibus Agreement is still void because Section 271 [of the] Delaware Code requires shareholder-approval."  A209 (Pls.' Opening Br. Supp. Mot. Prelim. Inj.).  Stream abandons this argument on appeal and asserts that Section 271 is "irrelevant."  Opening Br. at 14 ("The Charter Unambiguously Controlled The Class B Voting Shareholders' Blocking Rights; Section 271 Was Irrelevant.").

[62] *Salzberg*, 227 A.3d 102.

[63] *Id.* at 115.

[64] *Id.* (citing 8 *Del. C.* § 102(b)(1)).

*not transgress a statutory enactment or a public policy settled by the common law or implicit in the General Corporation Law itself.*"[65]

Thus, we proceed with analyzing whether the Class Vote Provision requires a vote of the Class B stockholders.[66]   Considering the plain and ordinary meaning of the term "disposition," we conclude that it does.  More specifically, the Omnibus Agreement effects an "Asset Transfer" that unambiguously triggers a majority vote of the Class B stockholders.  Therefore, extrinsic evidence is not used to interpret the Class Vote Provision.[67]

Next, because we disagree with the Court of Chancery that the language of the Class Vote provision of the Charter "tracks the text of Section 271,"[68] we do not look to Section 271 as an interpretative guide in construing the provision.  And because we conclude that a vote is required because the Omnibus Agreement falls within the materially broader definition of Asset Transfer, we need not resolve whether such a vote is also required under the plain language of Section 271, *i.e.,* whether the Omnibus Agreement effects a "sale,

---

[65] *Id.* at 115–16 (alteration in original) (emphasis added) (footnotes omitted) (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 118 (Del. 1952)).

[66] *See, e.g., Jones Apparel Grp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 840–41 (Del. Ch. 2004) (analyzing first whether Maxwell's charter precluded Maxwell's board from setting the record date in connection with plaintiff's consent solicitation (*i.e.,* the proper interpretation of the charter), and second, determining whether that charter provision was valid under the DGCL), *reprinted in* 30 Del. J. Corp. L. 284, 288–90 (2005).

[67] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

[68] *Stream TV*, 250 A.3d at 1044–45; *Stream TV*, 2021 WL 5816820, at *15 ("As explained in the Injunction Decision, the language of [the Asset Transfer] provision 'tracks the text of Section 271 and warrants the same interpretation.'").

lease or exchange" within the meaning of Section 271. In sum, we agree with the Vice Chancellor that the Omnibus Agreement effects an Asset Transfer under the Charter. However, because Section 271's language is materially different, our agreement ends there, as does our analysis, as the parties have raised no argument that the Charter violates "a public policy settled by the common law or implicit in the [DGCL] itself."[69]

Finally, although we need not further consider Section 271, we clarify that a common law insolvency exception, if one existed in Delaware, did not survive the enactment of Section 271 and its predecessor. Thus, there is no Delaware common law "board only" insolvency exception under Section 271. Rather, the enactment of Section 271 and its predecessor superseded any such common law exception, to the extent one existed in Delaware.

A. *The Charter Requires a Class B Stockholder Vote Because the Omnibus Agreement Effects an "Asset Transfer" under Stream's Charter.*

Stream argues that the Omnibus Agreement is both an Acquisition and an Asset Transfer, and therefore requires a vote of the Class B stockholders under the Charter. Because we conclude that the Omnibus Agreement effects an "Asset Transfer," we need not decide whether or not it also constitutes an "Acquisition."

"Delaware adheres to an objective theory of contracts, meaning that a 'contract's construction should be that which would be understood by an objective, reasonable third

---

[69] *See Sterling*, 93 A.2d at 118. Rather, the Court of Chancery identified only one public policy concern, namely, "interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest." *Stream TV*, 250 A.3d at 1042. Also, no party in this litigation has argued that in the context of judicial foreclosure proceedings, a stockholder vote is required. Rather, the Omnibus Agreement effects a type of privately-structured work-out.

25

party.'"[70] We "place[] great weight on the plain terms of a disputed contractual provision," and, therefore, we "interpret clear and unambiguous terms according to their ordinary meaning."[71] "We do not consider extrinsic evidence unless we find that the text is ambiguous."[72] "Ambiguity is present 'only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings[,]'"[73] and not "simply because the parties do not agree upon its proper construction."[74]

An affirmative vote of the holders of a majority of the then-outstanding shares of Class B stock is necessary to consummate an Asset Transfer. The Charter defines "Asset Transfer" as:

> a sale, lease or other disposition of all or substantially all of the assets or intellectual property of [Stream] or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream].[75]

The parties agree that the Omnibus Agreement is not a sale or lease of all of Stream's assets. The parties also agree that the Omnibus Agreement addresses all of the assets of Stream. Thus, Stream focuses on the phrase "*other disposition*" and argues that the

---

[70] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, --- A.3d ---, ---, 2022 WL 619700, at *5 (Del. Mar. 3, 2022).

[71] *Id.* (quoting *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019)).

[72] *Id.* (citing *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017)).

[73] *Id.* (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[74] *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1196.

[75] A126 (Charter § IV.D.4(b)(ii)).

Omnibus Agreement effects an Asset Transfer that requires a vote of Class B stockholders to be effective.

Stream argues that the words, "other disposition," are "broader" than the word "exchange" in Section 271. Further, Stream argues that the difference in word choice must be seen as "intentional" and reinforces a conclusion that the parties intended for the Charter to have a different meaning than the statute. We agree and conclude that the Charter's definition of Asset Transfer differs materially from Section 271. The definition of Asset Transfer changes Section 271's phrase of "sell, lease *or exchange*,"[76] to "sale, lease *or other disposition*."[77] Further, the Class Vote Provision contains express references to "intellectual property" and the granting of "exclusive licenses."[78] The drafters "could have simply tracked the language of the statute," but did not.[79] Accordingly, the Charter's use of the phrase "other disposition" has a meaning that is different, and broader, than the term "exchange."[80] It follows that, there is no need to look to Section 271 as an interpretative

---

[76] 8 *Del. C.* § 271(a).

[77] A126 (Charter § IV.D.4(b)(ii)).

[78] *Id.*

[79] *See Jones Apparel Grp. Inc*, 883 A.2d at 842 ("[T]he drafters [of a charter] could have simply tracked the language of the statute, but did not. That choice cannot be seen as anything other than intentional, reinforcing the conclusion that to read a proviso back into [the charter] allowing the board to set the record date would contravene the plain meaning of that provision.").

[80] *See, e.g., Wilmington Trust Co.*, 2008 WL 555914, at *8 (Del. Ch. Feb. 29 2008) ("[T]he words 'transfer' and 'disposition,' in particular, are inherently broad terms generally understood to encompass changes in title or ownership.").

guide in construing the language of the Class Vote Provision because the Charter's language does not track Section 271.[81]

That leads us to the key inquiry -- the meaning of "*other disposition*," which is not defined in the Charter. Corporate charters are contracts, and our rules of contract interpretation apply.[82] "The Court must first attempt to ascertain the parties' intent from the language of the contract."[83] Words or phrases used in a bylaw or charter are to be given their commonly accepted meaning, and this Court "often looks to dictionaries to ascertain a term's plain meaning."[84]

Black's Law Dictionary defines "disposition" as "[t]he act of transferring something to another's care or possession," "the relinquishing of property" and as "[a] final settlement or determination," such as a "court's disposition of the case."[85] Merriam-Webster defines "disposition" as "the act or the power of disposing or the state of being disposed: such as . . . a final arrangement[] settlement" and "the transfer to the care or possession of

---

[81] The Class Vote Provision is also more specific than Section 271 in function as it requires a majority vote of outstanding Class B shares whereas Section 271 requires a vote of all outstanding shares.

[82] *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 977 (Del. 2020); *Centaur Partners, IV*, 582 A.2d at 928.

[83] *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 56 (Del. 1995).

[84] *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020) (citing *Lorillard Tobacco Co. v. Am. Legacy Found*, 903 A.2d 728, 738 (Del. 2006)). *See State of Delaware Dep't of Nat. Res. And Env't Control v. McGinnis Auto & Mobile Home Salvage, LLC*, 225 A.3d 1251, 1260–61 (Del. 2020) (Valihura, J., dissenting) ("Delaware case law is well settled that undefined words are given their plain meaning based upon the definition provided by a dictionary.").

[85] *Disposition*, Black's Law Dictionary (11th ed. 2019). "Disposition" also contains specific definitions for certain types of dispositions, such as testamentary, ambulatory, and informal. *See id.*

28

another."[86]  Similarly, American Heritage defines "disposition" as "[a]n act of disposing; a bestowal or transfer to another."[87]  Cambridge Dictionary defines "disposition" as "the process of selling something or formally giving it to someone" and "the way in which a formal process, such as a business deal or a matter dealt with in a court of law, is completed."[88]  Collins similarly defines "disposition" as "a selling or giving away, as of property."[89]  Finally, Ballentine's Law Dictionary defines "disposition" as "[a]n arrangement.  A transfer of property.  The power of disposal."[90]  We conclude, as explained further below, that the term, "other disposition," includes the transfer of assets contemplated in the Omnibus Agreement.

The Omnibus Agreement effects a transfer and assignment of all rights, title and interest in all of Stream's assets for the benefit of Stream's creditors.  This is evident from the language of the agreement itself as it recites:

> WHEREAS, SLS and Hawk have each agreed to stay the [f]oreclosure and satisfy and extinguish each of the SLS Notes and the Hawk Notes in their entirety subject to the Company *assigning all right, title and interest in and to all assets of the Company* to a newly-formed holding company ("Newco") established by SLS and Hawk, in satisfaction of the SLS Notes and the Hawk Notes.[91]

---

[86] *Disposition*, Merriam-Webster, https://www.merriam-webster.com/dictionary/disposition (last visited Apr. 19, 2022).

[87] *Disposition*, The American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=disposition (last visited Apr. 19, 2022).

[88] *Disposition*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/disposition (last visited May 27, 2022).

[89] *Disposition*, Collins, https://www.collinsdictionary.com/us/dictionary/english/disposition (last visited May 27, 2022).

[90] *Disposition*, Ballentine's Law Dictionary (3d ed. 2010).

[91] A136 (Omnibus Agreement WHEREAS clause) (emphasis added).

Further, Section 1.1(a) of the Omnibus Agreement provides:

Each of SLS and Hawk shall agree to stay the [f]oreclosure *and satisfy and extinguish*, in their entirety, the SLS Notes and the Hawk Notes, respectively (collectively, the "Discharged Indebtedness"), upon the Company's immediate conveyance, *transfer*, delivery and *assignment, of all right, title and interest of the Company in, to or under all of the rights, properties and assets of the Company* (including those of any direct or indirect subsidiary of the Company) of every kind and description, wherever located, real, personal, or mixed, tangible or intangible, to the extent owned, leased, licensed, used or held for use in or relating to the business, as the same shall exist on the date hereof, *to Newco*, including, but not limited to, all right, title and interest of the Company (or any direct or indirect subsidiary of the Company) in, to and under the assets listed or described below (the "Transferred Assets")[.]"[92]

An assignment of all rights, title and interest in the assets of the Company to Newco is a "disposition" because it is a type of transfer or relinquishment of property. Dictionary definitions of "assignment" reinforce this conclusion. Black's Law Dictionary defines "assignment" as: "[t]he transfer of rights or property."[93] Merriam-Webster defines "assignment" as: "the transfer of property *especially*: the transfer of property to be held in trust or to be used for the benefit of creditors."[94] The American Heritage Dictionary defines "assignment" to mean: "[t]he transfer of a claim, right, interest or property from one to another."[95] Thus, "disposition" includes the assignment of Stream's assets to Newco (SeeCubic) under the Omnibus Agreement, thereby triggering the Class B Vote Provision.

---

[92] A137 (Omnibus Agreement § 1.1(a)) (emphasis added).

[93] *Assignment*, Black's Law Dictionary (11th ed. 2019).

[94] *Assignment*, Merriam-Webster, https://www.merriam-webster.com/dictionary/assignment (last visited May 10, 2022) (emphasis in original).

[95] *Assignment*, The American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=assignment (last visited May 10, 2022).

Further, the assignment of all rights, title, and interest in Stream's assets is a "disposition" because it effects a "relinquishing of property" in consideration for a resolution, settlement, or determination of certain claims. For example, Section 1.2 of the Omnibus Agreement provides:

1.2 Dismissal of Lawsuit and Foreclosure Action

In consideration of the Transactions contemplated by Section 1.1 of this Agreement and such other agreements as made be made [sic] among the parties hereto and upon consummation thereof, (i) the Investors hereby irrevocably agree to *forbear from including any claims against the Company or any of the Transferred Assets as part of the Lawsuit*, and (ii) each of the SLS and the Company *agree to dismiss their applicable claims or responses in the Foreclosure Action*.[96]

Transferring assets in consideration for resolving or settling certain claims falls within the common dictionary definitions of "disposition" set forth above. Thus, the transactions set forth in the Omnibus Agreement unambiguously effect a "disposition" as that term is commonly used.

SeeCubic disagrees, and argues that the term "other disposition" in this context is limited by the concept of *nonscitur a sociis*, a canon of construction that suggests words grouped together in a list should be given related meaning in light of the words around it.[97] SeeCubic asserts that an "other disposition" must mean something akin to a "sale" or a "lease" and that it "does not unambiguously include a transfer of assets to secured creditors

---

[96] A140 (Omnibus Agreement § 1.2) (emphasis added). Further, the recitals in the Omnibus Agreement (including the one quoted above) make clear that the agreement was intended to resolve the issues relating to Stream's default on the SLS and Hawk notes.

[97] Answering Br. at 19 ("Here, the undefined term 'other disposition' is limited to a similar meaning as the terms 'sale' and 'lease.'").

31

in satisfaction of debt."[98] We disagree that "other disposition" is ambiguous. Rather, as shown above, the plain meaning of "other disposition" includes the transactions contemplated in the Omnibus Agreement. "When the contractual provision is clear and unambiguous, the court will give the provision's terms their plain meaning."[99]

If any of the canons of construction applied, it would be the "elementary canon of contract construction" where "the intent of the parties must be ascertained from the

---

[98] *Id.* SeeCubic also argues that if "'other disposition' were intended to encompass all dispositions of Stream's assets without limitation, the terms 'sale' and 'lease'–which are dispositions—would be superfluous." *Id.* at 20.

[99] *E.I. du Pont de Nemours & Co.*, 711 A.2d at 57 (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)). *See BlackRock Credit Allocation Income Tr.*, 224 A.3d at 977 ("Under the applicable interpretation rules, if the bylaw's language is unambiguous, the court need not interpret it or search for the parties' intent."); *see also Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 365 n.56 (Del. 2013) ("[W]hile we will construe an ambiguous partnership agreement against the drafter under the *contra proferentem* doctrine, that doctrine only applies if the partnership agreement is ambiguous." (citing *SI Mgnt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del.1998))); *Rubick v. Sec. Instrument Corp.*, 766 A.2d 15, 18 (Del. 2000) ("If the statute is unambiguous, there is no room for interpretation, and the plain meaning of the words controls." (*Ingram v. Thrope*, 747 A.2d 545, 547 (Del. 2000))); *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 66 (Del. 1993) ("Where the intent of the legislature is clearly reflected by unambiguous language in the statute, the language itself controls." (quoting *Spielberg v. State*, 558 A.2d 291, 293 (Del. 1989))); Norman J. Singer & Shambie Singer, 2A *Sutherland Statutes and Statutory Construction* § 46:4 (7th ed.), Westlaw SUTHERLAND (database updated Nov. 2021) ("If a court does find that a statute is not clear and unambiguous, then it may look to a wide variety of intrinsic and extrinsic sources to discover the meaning of legislative language, including the maxims *expressio unius est exclusio alterius*, *ejusdem generis*, and *noscitur a sociis*, as well as legislative history . . . ." (footnote omitted)). In any event, our interpretation of the term "other disposition" respects the *noscitur a sociis* canon because it treats disposition, sale, and lease similarly—mainly as methods of transferring and assigning the right to use or own an asset. By specifying that "other disposition[s]" of assets would trigger the Class Vote Provision, the drafters made clear that "sale[s]" and "lease[s]" were themselves dispositions.

language of the contract."[100]  Reading the agreement as a whole,[101] other provisions within the Omnibus Agreement shed light on what the parties meant by "other disposition."  We note, for example, that the Charter's definition of "Transfer" as it pertains to Class B Voting Stock, defines "Transfer" as:

> *any sale, assignment, transfer, conveyance, hypothecation or other transfer or disposition of such share or any legal or beneficial interest in such share, whether or not for value and whether voluntary or involuntary or by operation of law; provided, however, that the following shall not be considered a "Transfer"*: (x) the granting of a proxy to officers or directors of the Company at the request of the Board of Directors of the Company in connection with actions to be taken at an annual or special meeting of stockholders, or (y) entering into a voting trust, agreement or arrangement (with or without granting a proxy) with the Founders.[102]

This definition reinforces that any assignment, transfer, conveyance, or hypothecation of the Class B shares is a "disposition" of such share, whether or not in value and whether or not voluntary or involuntary.

One could argue that the definition of "Transfer" provided above shows that the drafters knew how to ensure that specific types of transfers would pertain to dispositions of Class B *stock*.  It follows that one may find it significant that these events are not also specifically addressed in the context of transactions involving corporate *assets*, particularly

---

[100] *E.I. du Pont de Nemours & Co.*, 711 A.2d at 56 (quoting *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992)).  *See Cox Commc'ns Inc.*, 2022 WL 619700, at *5 (explaining that this Court reviews "questions of contract interpretation *de novo*, with the objective of determining the intent of the parties from the language of the contract" (footnote omitted) (citing *Exelon Generation Acquisitions, LLC*, 176 A.3d at 1267)).

[101] *See Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 918 n.28 (Del. 2021) ("Delaware courts 'read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage[.]'" (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010))).

[102] A131 (Charter § IV.D.6(a)(iv)) (emphasis added).

33

in the definition of Asset Transfer. However, the terms in the more expanded "Transfer" definition dealing with transfers of Class B Voting stock are entirely consistent with the plain meaning and common definitions of "disposition."[103] Reading the provisions as a whole, we see no inconsistency in these provisions and in construing "other disposition" to plainly encompass the contemplated transfer and assignment of Stream's assets for the benefit of its creditors in furtherance of a resolution of certain claims.[104]

*B. There Is No Common Law "Board-Only" Insolvency Exception to Section 271.*

We have concluded that the Omnibus Agreement unambiguously contemplates a transaction constituting an "Asset Transfer" triggering the Class Vote Provision. We clarify a final point, namely, whether there exists today an insolvency exception to Section 271. We conclude that any such exception that might have existed has been superseded.

The Vice Chancellor engaged in a thoughtful analysis of the common law pre-dating the enactment of Section 271 and its predecessor. Relying primarily on some treatises and

---

[103] *See Alta Berkeley VI C.V.*, 41 A.3d at 385–86 ("[I]t is well established that a court interpreting any contractual provision, including preferred stock provisions, must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." (quoting *Elliott Assoc., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998))); *see also Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." (citing *Osborn*, 991 A.2d at 1159–60)).

[104] We are mindful that an overly broad reading of the phrase "other disposition" could render certain exceptions within the definition of "Acquisition" superfluous, if these exceptions were read to fall into the catch-all definition of Asset Transfer. For example, the term "disposition" likely does not encompass "(x) any consolidation or merger effected exclusively to change the domicile of [Stream]," or "(y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by [Stream] or any successor or indebtedness of [Stream] is canceled or converted or a combination thereof." A126 (Charter § IV.D.4(b)(i)). Otherwise, these exceptions would be rendered meaningless. Therefore, the phrase "other disposition" must have some limits. However, we need not attempt to delineate what they are.

34

case law from other jurisdictions, the court determined that a board-only insolvency exception existed, despite the lack of any precedent in Delaware. These authorities ranged in date from 1926 to 1948, with no case cited after 1948 upholding such an exception.

In its P.I. Opinion, the Court of Chancery cited the following treatises:

- 1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* §§ 357, 358 (1891) (For "a failing company the rule is different, and sale of the whole property may be made by the directors.");[105]

- Thomas Conyngton & R.J. Bennett, *Corporation Procedure* 232 (rev. ed. 1927) (footnote omitted) ("The directors may, however, without authorization of the stockholders, sell the corporate assets if necessary to pay the corporate debt, and they may, in the absence of statutory or other prohibitions, make an assignment for the benefit of creditors.");[106]

- Henry Winthrop Ballantine, *Ballantine on Corporations* § 281, at 667 (1946) (footnote omitted) ("If a corporation is insolvent or in failing condition[,] the board of directors have authority to sell the entire assets in order to pay the debts and avoid the sacrifice of an execution sale[,] even without the vote or consent of the shareholders. They may also make an assignment for the benefit of creditors or file a voluntary petition in bankruptcy.");[107]

- 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 10.7 at 10–34 (3d ed. 1998 & 2011 Supp.) (acknowledging a "failing business" exception to the common law general rule that directors have no authority to sell out the entire property of the corporation and terminate its business).[108]

---

[105] *Stream TV*, 250 A.3d at 1035.

[106] *Id.*

[107] *Id.*

[108] *Id.* at 1036. In its Modification Opinion, the Court of Chancery supplemented this list with citations to the Cook, Purdy and later Noyes and Cox & Hazen treatises discussed herein. *See Stream TV*, 2021 WL 5816820, at *8–9, 11.

The Court of Chancery cited six cases from other jurisdictions,[109] and two Delaware cases, namely, *Butler v. New Keystone Copper Co.*, a case from 1915, and *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, a case from 1923.[110]  In *Butler*, the Court of Chancery confronted a litigation involving a sale of assets that occurred prior to the enactment of any statute addressing a sale of assets.  Chancellor Curtis stated that

> the general rule as to commercial corporations seems to be settled that neither the directors nor the stockholders of a prosperous, going concern have power to sell all, or substantially all, the property of the company if the holder of a single share dissent.  But if the business be unprofitable, and the enterprise be hopeless, the holders of a majority of the stock may, even against the dissent of the minority, sell all the property of the company with a view to winding up the corporate affairs.[111]

*Butler* bases its holding on the majority exception to the general rule requiring stockholder unanimity and does not address a board-only insolvency exception.

The court then cited *Allied Chemical* for the proposition that, when Section 271 was enacted, the General Assembly did not intend to govern a transfer of assets by a failing firm.[112]  Specifically, the court stated that "[t]he General Assembly enacted the statutory predecessor to Section 271 to make clear that the board of directors of a corporation, with

---

[109] *See Stream TV*, 250 A.3d at 1035 (citing *City Nat. Bank v. Fuller*, 52 F.2d 870, 872–73 (8th Cir. 1931); *Autauga Coop. Leasing Ass'n v. Ward*, 250 Ala. 229, 33 So. 2d 904, 906 (1948)); *Sherrard State Bank v. Vernon*, 243 Ill. App. 122, 128 (Ill. App. Ct. 1926); *Oskaloosa Sav. Bank v. Mahaska Cnty. State Bank*, 205 Iowa 1351, 219 N.W. 530, 533 (1928); *Candor v. Mercer Cnty. State Bank*, 257 Ill. App. 192, 197–98 (Ill. App. Ct. 1930); *Howard v. Republic Bank & Tr. Co.*, 76 S.W.2d 187, 191 (Tex. Civ. App. 1934).

[110] *See id.* at 1036–37 (citing *Butler*, 93 A. 380; *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486 (Del. Ch. 1923)).

[111] *Butler*, 93 A. at 382; *Stream TV*, 250 A.3d at 1036.

[112] *Stream TV*, 250 A.3d at 1041.

36

the approval of a majority of its stockholders, could sell all of the firm's assets, even if the corporation was profitable and solvent."[113]  According to the court, because the common law did not prohibit the board of directors of an *insolvent* or *failing* firm from transferring its assets to creditors, "the General Assembly did not need to establish that point by statute."[114]

We have independently surveyed the law, and we concur that the weight of treatise authority, supported by cases from various states, supports the existence, at least in the early part of the twentieth century, and at least in certain jurisdictions, of certain common-law rules governing sales of all assets, including the following:

- If a corporation is solvent and profitable, then a sale of all assets requires unanimous approval by all stockholders.

- If a corporation is solvent but unprofitable and without prospect of becoming profitable, then a sale of all assets may be made with the approval of a majority of the stockholders.

- If a corporation is insolvent, then a sale of all assets may be made by the directors without stockholder approval.

At least five treatises, published before the Delaware General Assembly's enactment of Section 271's predecessor in 1917, support the existence of these rules.

First, Charles Fisk Beach, in his 1891 treatise, states that, "a majority of the shareholders of a prosperous corporation can not sell out the property and invest in other

---

[113] *Id.* (citing *Allied Chem.*, 120 A. at 490).

[114] *Id.*

enterprises against the wishes of the minority."[115]  He observes that, "in [the] case of a failing company the rule is different, and sale of the whole property may be made by the directors."[116]

Second, an 1898 treatise by William W. Cook states that "[n]either the directors nor a majority of the stockholders have power to sell all the corporate property as against the dissent of a single stockholder, unless the corporation is in a failing condition."[117] Arguably this passage supports the existence of the board-only exception by negative implication.  The 7th edition of Cook's treatise (published in 1913) cites *Common Sense Mining & Milling Co. v. Taylor* with approval,[118] in which the Missouri Supreme Court held that a "corporation being in failing circumstances, the directors had the legal right to dispose of its assets to pay its debts."[119]

Third, a 1905 treatise, authored by James Hart Purdy, repeats that a majority of the shareholders of a prosperous corporation cannot sell against the wishes of the minority, but that in the case of a failing company, the sale may be made by the directors.[120]

---

[115]  1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* § 357, at 582 (1891).

[116] *Id.*

[117] William W. Cook, *A Treatise on the Law of Corporations Having a Capital Stock* § 670, at 1337 (4th ed. 1898) (emphasis omitted).

[118] William W. Cook, *A Treatise on the Law of Corporations Having a Capital Stock* § 670, at 2604 n.2 (7th ed. 1913).

[119] *Common Sense Mining & Milling Co. v. Taylor*, 247 Mo. 1, 152 S.W. 5, 10–11 (1912).

[120] James Hart Purdy, *Treatise on the Law of Private Corporations* § 830, at 1243–44 (1905). Purdy does not cite Beach.  Purdy does add two additional case citations, namely, *Miners' Ditch Co. v. Zellerbach*, 37 Cal. 543, 99 Am. Dec. 300 (1869); *Bartholomew v. Derby Rubber Co.*, 69 Conn. 521, 38 A. 45 (1897).

Fourth, the 1909 treatise by Thompson & Thompson states that at common law, "neither the directors nor the majority of the stockholders of a prosperous corporation, able to achieve the objects of its creation, had power to sell or otherwise dispose of all the property without the unanimous consent of all stockholders."[121] But this treatise notes that the majority of stockholders may dispose of all the corporate property "where the continuation of the business would be at a loss and where there was no prospect or hope that the enterprise could be made profitable."[122] The treatise further explains that the board may dispose of all the corporate property when "by reason of its embarrassed or insolvent condition[, the corporation] is unable either to pay its debts or to secure capital and funds for the further prosecution of its enterprise," especially where creditors are pressing their claims and threatening litigation.[123]

Fifth, according to a 1909 treatise by Walter Chadwick Noyes, "[t]he general rule that a majority cannot sell the entire assets of a prosperous corporation is based upon the principle that a majority cannot control corporate powers to defeat corporate purposes."[124] The treatise distinguishes between a "losing" corporation – one in which "the further prosecution of the business of the corporation would be unprofitable"[125] – and an insolvent

---

[121] 3 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Private Corporations* § 2421, at 342 (2d ed. 1909).

[122] *Id.* § 2424, at 345.

[123] *Id.* § 2418, at 336.

[124] Walter Chadwick Noyes, *A Treatise on the Law of Intercorporate Relations* § 111, at 210 (rev. 2d ed. 1909).

[125] *Id.* at 211.

39

corporation. Because the disposal of all the assets of a losing corporation furthers the corporate purpose, the treatise notes that it may be accomplished by a majority of the stockholders.[126] The directors, on the other hand, are "equally without implied authority to wind up [a corporation's] affairs and dispose of its assets" in a solvent corporation *and* in a "losing, but not insolvent, corporation." As the treatise explains, in a losing corporation, the transfer of all assets "involves primarily the relations between a corporation and its stockholders."[127] But in an insolvent corporation, such transfer is a matter of "the relations between a corporation and its creditors."[128] "In the absence of a controlling statute or by-law of the corporation, the directors have power to authorize an assignment of the property of an insolvent corporation for the benefit of its creditors."[129]

Two later treatises also acknowledge the existence of a board-only insolvency exception. First, *Ballantine on Corporations* (1946) states that "[i]f a corporation is insolvent or in failing condition[,] the board of directors have authority to sell the entire assets in order to pay the debts and avoid the sacrifice of an execution sale even without the vote or consent of the shareholders."[130]

Ballantine observes that under statutes adopted in more than forty states, "a

---

[126] *Id.*

[127] *Id.* § 112, at 212.

[128] *Id.* at 213 ("The assignment of property by an insolvent corporation for the purpose of paying its debts is a very different action from so disposing of its property while solvent as to make its continued exercise of its franchises impossible." (citing *Vanderpoel v. Gorman*, 140 N.Y. 563, 568, 35 N.E. 932, 934 (1894))).

[129] *Id*.

[130] Henry Winthrop Ballantine, *Ballantine on Corporations* § 281, at 667 (1946).

prosperous and going [concern] corporation may with the vote or consent of its board of directors and two-thirds of its voting shareholders or some other specified majority, sell and convey all or substantially all [of] its property rights."[131]  These provisions were adopted to relax the strict common law unanimity rule.  "Some of these statutory requirements apply even though the corporation is insolvent, particularly if the sale is made for the purpose of reorganization and continuance of the business in another corporation rather than for the purpose of liquidation."[132]  However, "[i]n other states expressly or by implication the requirements of such a statute are held not to apply to insolvent corporations."[133]

Second, Cox and Hazen's *Treatise on the Law of Corporations* states that, "[i]f a corporation is insolvent or in failing condition, the common law recognizes the authority of the board of directors to sell the entire assets without the vote or consent of the shareholders in order to pay the debts of the corporation and avoid the sacrifice of an execution sale.  The directors may also make an assignment for the benefit of creditors or file a voluntary petition in bankruptcy."[134]

Cases from at least fifteen states, from the late 1800's to the early 1900's, support

---

[131] *Id*. § 282, at 668.

[132] *Id*. Notably, Ballantine observes that, "if the purpose of a sale is [a] reorganization or recapitalization as contrasted with liquidation and dissolution, that class voting should be required as much as in [the] case of merger or consolidation."  *Id*. at 669.

[133] *Id*. at 668.  *See also infra* note 171 (citing Fletcher noting that courts in different jurisdictions vary on whether such statutory provisions have altered the common law rules for corporations in financial distress).

[134] 4 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 22:4 (3d ed., rev. Dec. 2021), *available at* Westlaw (Dec. 2021 update) (footnote omitted).

the existence of the board-only insolvency exception in those jurisdictions during that time:

Alabama,[135] California,[136] Connecticut,[137] Illinois,[138] Indiana,[139] Iowa,[140] Massachusetts,[141]

---

[135] *Autauga Coop. Leasing Ass'n*, 33 So. 2d at 906 (Prior to passage of a state statute in 1911, if corporation was "insolvent or in failing condition, the directors or a majority of its stockholders could sell all its property without any special procedure."); *Chamberlain v. Bromberg*, 83 Ala. 576, 581, 3 So. 434, 435 (1888) ("We think it too clear to admit of discussion, unless our statutes after noticed have made a change, that the Alabama Insurance Company, being unable to meet its debts, had the power to make an assignment for the benefit of its creditors, if done in good faith; that the board of directors, as its governing body, was the proper authority to execute that power . . . .").

[136] *Miners' Ditch Co.*, 37 Cal. at 593 (citing with approval *Sargent v. Webster*, 54 Mass. 497, 498 (1847)).

[137] *Mills v. Tiffany's*, 123 Conn. 631, 640, 198 A. 185, 189 (1938) (noting that a statute requiring approval by vote of two-thirds of the stockholders was inapplicable to "a sale of all its assets by a corporation which is insolvent or in failing circumstances made for the purpose of closing up its affairs" (citing *Bassett v. City Bank & Tr. Co.*, 116 Conn. 617, 165 A. 557 (1933))); *Chase v. Tuttle*, 55 Conn. 455, 12 A. 874, 875–76 (1888) (upholding directors' assignment of an insolvent corporation's assets for the benefit of creditors). The court in *Mills* suggested that the insolvency exception would not apply if the purpose of the sale was the continuation of the business in another corporation and not the bona fide winding up of its business. *Mills*, 198 A. at 189.

[138] *Candor*, 257 Ill. App. at 197–98 ("The general rule is that where a business is in a failing condition and has become financially involved and insolvent, and the creditors are pressing their claims, the directors may dispose of the assets without the sanction of the stockholders, when it is deemed of imperative necessity." (citing *Oskaloosa Sav. Bank*, 219 N.W. at 530)).

[139] *De Camp v. Alward*, 1876 WL 6785, at *3 (Ind. May 1, 1876) (Assignment for the benefit of creditors "may be made by the board of directors, without the express authority or consent of the stockholders." (citing *Dana v. Bank of U.S.*, 1843 WL 5023 (Pa. Jan. 1, 1843))).

[140] *Oskaloosa Sav. Bank*, 219 N.W. at 533 ("[I]t is an exception to the general rule that where a business is in a failing condition and has become financially involved and insolvent, and the creditors are pressing their claims, the power of the directors to alienate the property is conceded where it is regarded as of imperative necessity.").

[141] *Sargent*, 54 Mass. at 497 ("The directors of an insolvent manufacturing corporation have authority to convey all the property of the corporation to one of its creditors, upon condition that he shall apply the property to the payment of his claim, and pay over the surplus, if any, to the treasurer of the corporation."); *In re E.T. Russell Co.*, 291 F. 809, 816 (D. Mass. 1923) (Assignment of all assets to creditor for payment of debts "is something the directors have power to do[,]" and also stating that a "sale" does not include an assignment for the benefit of creditors and, thus, "the powers of the corporation to execute assignments for the benefit of creditors are not conferred by law upon the stockholders.").

Michigan,[142] Minnesota,[143] Missouri,[144] Montana,[145] New York,[146] Pennsylvania,[147]

<hr>

[142] *Boynton v. Roe*, 114 Mich. 401, 407, 72 N.W. 257, 259 (1897) ("It is well settled in this state than an insolvent corporation has the right to make a general assignment of its property for the benefit of its creditors, unless prohibited by its charter or a statute of the state. The directors may make such assignment for the benefit of creditors without the assent of the stockholders." (citation omitted)). *But see Michigan Wolverine Student Coop. v. Wm. Goodyear & Co.*, 314 Mich. 590, 600, 22 N.W.2d 884, 888 (1946) ("We are not in accord with the proposition that in this State the directors of a domestic corporation may sell all or substantially all of the assets of the corporation without the consent or approval of the holders of a majority of the shares, on the ground that the corporation was 'in financial distress' or 'in a failing condition.'").

[143] *Tripp v. Northwestern Nat'l Bank*, 41 Minn. 400, 403, 43 N.W. 60, 61 (1889) ("The weight of authority seems to be in favor of the proposition that the board of directors of a corporation to which the general management of its affairs is committed, without particular restriction, may authorize a general assignment of the corporate property to be made for the benefit of creditors when the condition of its affairs is such as to reasonably justify such a course, as in the case of insolvency.").

[144] *Common Sense Mining & Milling Co.*, 152 S.W. at 10–11 ("The corporation being in failing circumstances, the directors had the legal right to dispose of its assets to pay its debts."); *Calumet Paper Co. v. Haskell Show-Printing Co.*, 144 Mo. 331, 45 S.W. 1115, 1115 (1898) ("Where there is nothing in the charter or by-laws of an insolvent corporation prohibiting it, the board of directors of such a corporation may make an assignment of its property for the benefit of its creditors." (citing *Chew v. Ellingwood*, 1885 WL 7913, at *2 (Mo. Apr. 1, 1885); *Descombes v. Wood*, 91 Mo. 196, 4 S.W. 82, 85 (1887)); *Hutchinson v. Green*, 91 Mo. 367, 1 S.W. 853, 855 (1886) ("[W]hen the corporation becomes crippled, and unable to meet its obligations in the usual course of business, it is competent for the directors to make an assignment, and this they may do without the consent of the stockholders."); *Chew*, 1885 WL 7913, at *7 ("The right of the directors of a bank in failing circumstances to make an assignment for the benefit of creditors, where there is nothing in the charter or general laws forbidding it, we think, is clear.").

[145] *Wortman v. Luna Park Amusement Co.*, 61 Mont. 89, 201 P. 570, 571 (1921) ("To summarize some of the rules of common law so far as applicable to the instant case, a solvent and prosperous corporation could sell all of its assets only by unanimous consent of its stockholders; *if insolvent* and unable to execute the purposes of its creation, *by the directors* if the best interests of the stockholders demanded; in the proper pursuit of its business, and within the purposes of its creation, sell any or all assets even against the dissent of a minority or perhaps a majority of its stockholders." (emphasis added)).

[146] *Vanderpoel*, 140 N.Y. at 576 ("The corporation had the power to make an assignment. It was a corporate act and neither the statute nor any by-law, so far as the record shows, provided that it should be otherwise done than by the president and secretary or treasurer, under the authority of the board of directors.").

[147] *Ardesco Oil Co. v. N. Am. Oil & Mining Co.*, 66 Pa. 375, 382, 1871 WL 10959, at *6 (Pa. Jan. 3, 1871) ("[A]n insolvent corporation may make a general assignment for the benefit of its

Texas,[148] and Wisconsin.[149]  Some authorities that reject the board-only insolvency exception do so on the basis of state statutes.[150]

Yet no Delaware case expressly addresses or adopts the board-only insolvency exception.[151]  The closest Delaware came to addressing the exception was in *Butler v. New Keystone Copper Co.*[152]  Although the Chancellor in *Butler* did not mention the board-only exception, he did cite two treatises that generally acknowledged the exception:  Thompson

creditors, and this power may be exercised by the directors, unless special provision to the contrary is made in the charter[.]" (citing *Dana*, 1843 WL 5023, at *8).

[148] *Birmingham Drug Co. v. Freeman*, 15 Tex. Civ. App. 451, 454, 39 S.W. 626, 628 (1897) ("[A]n insolvent corporation may make a general assignment for the benefit of its creditors, and this may be exercised by the directors, or under their authority.").

[149] *Goetz v. Knie*, 103 Wis. 366, 79 N.W. 401, 402 (1899) (acknowledging cases where "it was held that the board of directors of an insolvent corporation has power to make a voluntary assignment of all its property for the benefit of its creditors, without the authority or consent of its stockholders, unless restrained by its charter or other legal enactment.").

[150] *See, e.g.*, *Kyle v. Wagner*, 45 W. Va. 349, 32 S.E. 213, 214 (1898) (The court noted the existence of "numerous authorities" for the board-only insolvency exception but held that this rule was abrogated in West Virginia by statute providing for voluntary dissolution and windup of corporations by the stockholders instead of assignment of assets by directors.  Thus, the court held that the directors had no authority to direct the assignment of the entire property without the consent of the stockholders.).

[151] Although defendants raised the issue in *Russell v. Morris*, the Court of Chancery declined to address whether § 271 applied to "the sale of assets by a failing company facing an emergency situation" because it found that no emergency existed.  1990 WL 15618, at *4–5 (Del. Ch. Feb. 14, 1990) ("Defendants also contend that the transaction is valid and Russell's motion must be denied because § 271 does not apply to a sale of assets by a failing company facing an emergency situation.  Even assuming such an exception exists under our law, I need not address it here because the facts clearly indicate that no emergency requiring three hours notice of a board meeting existed."), *appeal refused*, 577 A.2d 754, 1990 WL 84682 (Del. 1990) (ORDER).

[152] *Butler*, 93 A. 380.

& Thompson's *Commentaries on the Law of Private Corporations* and Cook's *A Treatise on the Law of Corporations Having a Capital Stock*.[153]

Both *Butler* and *Allied* addressed circumstances under which a corporation could sell its assets with majority stockholder approval. We understand the Vice Chancellor's response, set forth in his final opinion in this matter, namely, that if a sale of assets obtained majority stockholder approval, "then the court did not need to address whether the corporation's condition was sufficiently dire that the directors alone would have had authority to effectuate the sale."[154] But we note that in *Allied Chemical*, Chancellor Wolcott observed that Section 64(a), the predecessor to Section 271(a), "remains in the law to-day [sic] and fixes in statutory form the rule imposed on *all* corporations organized under the general act by which they are to be governed *whenever* the question of the sale of their entire assets is under consideration."[155]

Therefore, *Butler* and *Allied Chemical* can also be read to suggest that Section 271's predecessor provided the only default rule and did not save room for a "board only" insolvency exception for transactions otherwise falling within the statute's ambit. We think this is the better view. For one thing, given the complete absence of any Delaware case support, it is not entirely clear that the exception was ever adopted in Delaware in the first

---

[153] *Butler* cites to Sections 2471 and 2424 of the Thompson & Thompson treatise. However, the reference to the board-only exception is in Section 2429 which the court in *Butler* did not cite.

[154] *Stream TV*, 2021 WL 5816820, at *8. The Vice Chancellor acknowledged that "*Butler* did not specifically involve the insolvency-based exception that permits directors to sell all of a corporation's assets without stockholder approval." *Id.* at *10. This was also true of *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 595–96 (1921).

[155] *Allied Chem.*, 120 A. at 490 (emphasis added).

place. It follows, that before addressing whether a statute supersedes the common law, it must be established that the exception was indeed part of the common law in that jurisdiction.[156] Ascertaining the initial question of what the common law *is* often is not an easy task.[157] Stream argues that Delaware chose to adopt a majority vote exception instead of an insolvency exception.[158] It argues that our General Assembly then codified the majority exception set forth in *Butler* in Section 64a.

---

[156] It is a fundamental principle of State sovereignty that the common law decisions of some jurisdictions are merely persuasive authority in the law of another jurisdiction until that State's courts adopt it. *See, e.g.*, *Casey v. Beeker*, 321 So. 3d 662, 670 (Ala. 2020) (concurring opinion) (discussing how treatises are only persuasive authority, may differ in applicability by jurisdiction, and can vary in persuasiveness based on the relevance and age of the source); *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 82, 69 N.E.3d 834, 859 ("[D]ecisions from other state courts and secondary sources are not binding on [the Supreme Court of Illinois] . . . ."); *Cadillac Rubber & Plastics, Inc. v. Tubular Metal Sys., LLC*, 331 Mich. App. 416, 425, 952 N.W.2d 576, 581 n.2 (2020) ("Treatises are not binding authority but may be considered persuasive." (citing *Fowler v. Doan*, 683 N.W.2d 682, 686 (Mich. Ct. App. 2004))). *See generally* A. W. B. Simpson, *The Rise and Fall of the Legal Treatise: Legal Principles and the Forms of Legal Literature*, 48 U. Chi. L. Rev. 632, 676 (1981) ("From the beginning, the treatise in America had to contend with the considerable number of different jurisdictions in which the law was administered, each state potentially possessing its own common law. This obviously presented an obstacle to the exposition of a universal common law by the text writers.").

[157] This is evidenced by the painstaking work done by the American Law Institute in formulating the various Restatements of the Law. For example, as the recent draft of the Restatement of the Law of Corporate Governance, Tentative Draft No. 1 (April 2022) notes at its outset that Restatements "aim at clear formulations of the common law . . . ," and that the Restatement process seeks first to "ascertain the nature of the majority rule." *Id*. at x. "If most courts faced with an issue have resolved it in a particular way, that is obviously important to the inquiry." *Id*. The draft further observes that:

> Like a Restatement, the common law is not static. But for both a Restatement and the common law the change is accretional. Wild swings are inconsistent with the work of both a common-law judge and a Restatement. And while views of which competing rules lead to more desirable outcomes should play a role in both inquiries, *the choices generally are constrained by the need to find support in sources of law*.

*Id*. at x–xi (emphasis added).

[158] Opening Br. at 31–34.

Even if we were to determine that a board-only insolvency exception was part of our common law at one time, the pivotal question is whether it survived the enactment of Section 64a. As explained below, we do not believe it did, assuming, *arguendo*, it existed.

In 1917, the Delaware General Assembly responded to *Butler*'s affirmation of the common law unanimity rule by enacting Section 64a. This section superseded the common law rule requiring unanimous consent to the sale, lease or exchange of all the property and assets of the corporation. Instead, it provided for a majority vote of the outstanding stock:

> Every corporation organized under the provisions of this chapter, may at any meeting of its board of directors, sell, lease or exchange all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions as its board of directors deem expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of a majority of the holders of the voting stock issued and outstanding, provided, however, that the certificate of incorporation may require the vote or written consent of a larger proportion of the stockholders.[159]

When Delaware comprehensively revised its General Corporation Law in 1967, Section 64a was renumbered Section 271(a), and language was added to clarify that the provision covered sales, leases, or exchanges of "substantially all" assets and that permissible consideration included "money or other property."[160] The General Assembly

---

[159] 29 Del. Laws ch. 113, § 17 (1917). Section 64a was amended in 1925 to replace the phrase "a majority of the holders" with "the holders of a majority" and "a larger proportion of the stockholders" with "a larger proportion of the stock issued and outstanding." 34 Del. Laws ch. 112, § 13 (1929). In 1929, the statute was amended again to allow the consideration to include "shares of stock in, and/or other securities of, any other corporation or corporations." 36 Del. Laws ch. 135, § 19 (1925).

[160] 56 Del. Laws ch. 50, § 271 (1967).

also added Section 272.[161]   Section 272 clarified that Section 271 does not apply to

mortgages or pledges of corporate assets.[162]   The Delaware General Corporation Law

Revision Committee, the group tasked with drafting the comprehensive revisions,

considered adding a specific exception for sales in the ordinary course of a corporation's

business, but ultimately decided not to do so.[163]   Other provisions were eliminated as

unnecessary or redundant.[164]

---

[161] 56 Del. Laws ch. 50, § 272 (1967); *see* 8 *Del. C.* § 272.

[162] 3 Robert S. Saunders, Allison L. Land, Jennifer C. Voss, & Cliff C. Gardner, *Folk on the Delaware General Corporation Law* § 272.01 (7th ed., 2022-1 Supp.); *accord* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations* § 10.1 (4th ed. 2022-1 Supp.).

[163] *See* Samuel Arsht, *Memorandum to the Corporation Law Revision Committee  on Folk Report on Proposed 1967 Amendments* (Sept. 14, 1965) ("Folk points out many states and Model Act expressly dispense with stockholder approval for sales of all assets in usual course of business and for mortgages or pledges, unless charter requires it.  He suggests appropriate language to this effect at page 209."); *Minutes of the Twenty-Second Meeting of Delaware Corporate Law Study Committee* (Sept. 14, 1965) ("Disapproved the recommendation with respect to sale of all assets in the course of business.").

[164] For example, as the Vice Chancellor observed, prior to 1967, the DGCL contained a provision that authorized "[s]ales of the property and franchises" of a corporation "under a decree of Court . . . ." *Stream TV*, 250 A.3d at 1038 (alteration in original).  That provision did not require either board approval or a stockholder vote to consummate a sale of assets to a secured creditor by decree. "As part of the 1967 revision, the General Assembly eliminated this provision," likely because it is "unnecessary" given the rights afforded to secured creditors.  *Id.*  Section 271 was subsequently amended five times.  None of the amendments bears on this analysis.  57 Del. Laws ch. 148, § 30 (1969) (Amended to remove the reference to stockholder approval by written consent, as this was made redundant by § 228, and to add that the notice to stockholders of a meeting to vote on a proposed transaction under § 271 must state that this is the purpose of the meeting.); 64 Del. Laws ch. 112, § 55 (1983) (adding a clause to cover non-stock corporation); 65 Del. Laws ch. 127, § 9 (1985) (inserting "the holders of" into § 271(a) between "resolution adopted by" and "a majority of the outstanding stock"); 75 Del. Laws ch. 30, § 28 (2005) (adding subsection (c), which permits transfers of all or substantially all assets of a parent corporation to a wholly-owned subsidiary without a stockholder vote); 77 Del. Laws ch. 253, § 58 (2010) (As part of a comprehensive revision of the DGCL to address nonstock corporations, Section 271(a) was revised to provide that, in addition to members who are entitled to vote for the election of a nonstock corporation's governing body, any other members given the right to vote on the sale of all or substantially all of

The Vice Chancellor concluded that Section 271 superseded only one aspect of the common law rule, namely, the unanimity requirement but "did not supersede the common law's recognition that directors could sell the assets of an insolvent or failing firm without stockholder approval."[165]  We disagree.  In *A.W. Financial Services, S.A. v. Empire Resources, Inc.*,[166] this Court set forth the analysis we employ when determining whether the enactment of a statute has superseded the common law.[167]  We applied the following three-pronged inquiry: (1) does explicit language in the statute supersede or limit the common law; (2) does the statutory scheme evidence a legislative intent to occupy the field; and (3) does the statutory scheme actually conflict with the common law.[168]

The plain language of Section 271 suggests the answer to the first two questions as Section 271 applies to "*[e]very corporation . . . ,*" and requires a vote by the holders of a majority of the corporation's outstanding shares when their corporation engages in a sale, lease, or exchange of "all or substantially all of its property and assets."[169]  The creation of Section 64a's majority vote rule indisputably replaced the common law unanimity rule.[170]

---

the corporation's assets under the corporation's certificate of incorporation or by-laws are also entitled to do so.).

[165] *Stream TV*, 2021 WL 5816820, at *13.

[166] 981 A.2d 1114 (Del. 2009).

[167] *Id.* at 1123.  The concept of "'[s]uperseder' describes circumstances where a statute replaces or ousts ('supersedes') the common law." *Id.* at 1121.  *See Cline v. Prowler Indus. of Maryland, Inc.*, 418 A.2d 968, 977–78 (Del. 1980) (analyzing whether it was the General Assembly's intent to supersede the doctrine of strict tort liability in cases involving a sale of goods when it adopted the Uniform Commercial Code).

[168] *A.W. Fin. Servs., S.A.*, 981 A.2d at 1123.

[169] 8 *Del. C.* § 271(a) (emphasis added).

[170] One might logically view the statute as a restriction, rather than expansion of stockholder rights. *See Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 376 (Del. Ch. 2004) ("The origins of §

The question is whether the rule's exceptions were abrogated as well. We think the better view is that, when the common law unanimity rule was superseded, so too was any insolvency exception to that rule.[171] This conclusion is reinforced by the plain language of Section 271, which contains no exceptions and is not ambiguous.[172] As such, the language

271 did not rest primarily in a desire by the General Assembly to protect stockholders by affording them a vote on [the] transactions previously not requiring their assent. Rather, § 271's predecessors were enacted to address the common law rule that invalidated any attempt to sell all or substantially all of a corporation's assets without unanimous stockholder approval.").

[171] Cases from other jurisdictions are mixed on whether similar statutes apply to a sale of all or substantially all assets by the directors of an insolvent corporation. In *Mills v. Tiffany's*, the Supreme Court of Errors of Connecticut held that a Connecticut statute, providing that a corporation "may sell, lease, or exchange all its assets when that action is authorized by a vote of two-thirds of the outstanding stock of each class at a meeting duly warned and held for the purpose[,]" did not apply to a sale of all assets of an insolvent corporation made for the purpose of winding up its affairs. 198 A. at 189. That court cited *Basset v. City Bank & Trust Co.*, which explained that the statute was intended to supersede the common law unanimity rule and thus, transactions to which that general rule did not apply at common law were "outside the scope and purpose of the statute[.]" 165 A. at 561. However, in *Michigan Wolverine Student Cooperative*, the Supreme Court of Michigan stated that "[t]he statute does not authorize the board of directors of a corporation to sell all or substantially all of the corporate assets whenever, in the opinion of the directors, the corporation is not a going and prosperous concern, or is in a failing condition. If a corporation is no longer a going concern the statute provides several methods whereby the corporation may wind up its affairs, dispose of its assets, and cease to exist. None of these methods authorizes a board of directors to wind up corporate affairs and dispose of the assets without action by the stockholders, or by a court." *Michigan Wolverine Student Coop.*, 22 N.W.2d at 888. Yet this is *dicta* because the Supreme Court of Michigan ultimately assumed, *arguendo*, there was room in the statute for such an exception, but found that the corporation was solvent, and therefore, that the common law exception did not apply (even assuming it existed and survived the enactment of Michigan's § 271 analogue). *See also* 6A Fletcher Cyc. Corp. § 2949.21 (2021) (observing that "[a] question may arise concerning what bearing these statutory provisions have on the common-law rules regarding a corporation in financial distress or in a failing condition. Some of these statutory requirements have been held to apply even though a corporation is insolvent. On the other hand, in some jurisdictions, expressly or by implication, the requirements of such statutes have been held not to apply to insolvent corporations." (footnotes omitted)).

[172] *See Balma v. Tidewater Oil Co.*, 214 A.2d 560, 562 (Del. 1965) (stating that "[w]ords in a statute must be given ordinary meaning[,]" and that "[c]ourts have discretion to construe statutes only when they are obscure or doubtful in their meaning. Where its language is clear and unambiguous, a statute must be held to mean that which it plainly states, and no room is [left] for construction.").

of the statute should be conclusive of the General Assembly's intent.[173] In this sense, a "board only" insolvency exception is inconsistent with a statutory default majority vote rule.[174] Thus, we conclude that Section 271 was intended to occupy the field and that no such insolvency exception survives, assuming *arguendo*, that it existed in the first place.[175]

As a matter of policy, unearthing a "board only" insolvency exception cited only decades ago, and never by any Delaware court, would foster uncertainty and potential inconsistency in a context where predictability is crucial for corporations that have availed themselves of Delaware law. "Our General Assembly has [] recognized the need to maintain balance, efficiency, fairness, and predictability in protecting the legitimate interests of all stakeholders, and to ensure that the laws do not impose unnecessary costs on Delaware entities."[176] Promoting stability in our DGCL is and remains of paramount

---

[173] *See Dewey Beach Enters., Inc. v. Bd. of Adjustment of Town of Dewey Beach*, 1 A.3d 305, 307 (Del. 2010) ("If [a statute] is unambiguous, no statutory construction is required, and the words in the statute are given their plain meaning."); *Grand Ventures, Inc.*, 632 A.2d at 68 (observing that, "[i]n the absence of any ambiguity, the language of the statute must be regarded as conclusive of the legislature's intent[,]" and in such a circumstance, "[t]he judicial role is then limited to an application of the literal meaning of the words"); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985) (explaining that if a statute is unambiguous, "the Court's role is then limited to an application of the literal meaning of the words." (citing *Delaware Solid Waste Auth. V. News-Journal Co.*, 480 A.2d 628, 634 (Del. 1984))).

[174] *See also* Balotti & Finkelstein, *supra* note 162, § 10.7 ("As a practical matter, in many instances federal bankruptcy statutes and other statutes governing creditors' rights have displaced the common law exception by providing explicit methods for addressing proposed asset dispositions by failing businesses.").

[175] *See Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 606 (Del. Ch.), *aff'd,* 316 A.2d 619 (Del. 1974) ("If the sale is of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation, then it is beyond the power of the Board of Directors.").

[176] *Salzberg*, 227 A.3d at 136.

51

importance.[177]  Stability and predictability are not advanced by reading Section 271 to

embody a common law exception that was never the basis of a single holding by any

Delaware court nor by other courts, according to the parties, for decades.

Instead, we think, the focus should be on the statute's plain language.  As we said

in *Salzberg*, the "most important consideration for a court in interpreting a statute is the

words the General Assembly used in writing it."[178]  As to Section 271 in particular, this

notion was reinforced by the Court of Chancery when then-Vice Chancellor Strine wrote:

---

[177] In aid of this goal, for example, Article IX of the Delaware Constitution requires a two-thirds supermajority vote of both chambers of our General Assembly to amend the DGCL.  Del. Const. art. IX, § 1 ("No general incorporation law, nor any special act of incorporation, shall be enacted without the concurrence of two-thirds of all the members elected to each House of the General Assembly.").

[178] *Salzberg*, 227 A.3d at 113 (quotation marks omitted).  As we note above, we need not reach the question of whether a private foreclosure transaction, such as the one here, falls within the plain language of Section 271, and specifically, whether it would qualify as a "sale, lease or exchange" within the meaning of Section 271.  The Vice Chancellor, relying on dictionary definitions, provided the following observations:

> Black's Law Dictionary contains an extensive section on the term "sale."  The hallmarks of the various definitions include (i) the status of the parties as "buyer" and "seller," (ii) the exchange of money or other property in return for goods and services, and (iii) a transfer or title.  *See Sale*, Black's Law Dictionary (11th ed. 2019).  Black's Law Dictionary distinguishes a "sale" from a "foreclosure sale," defining "foreclosure sale" to mean "[t]he sale of mortgaged property, authorized by a court decree or a power-of-sale clause, to satisfy the debt."  In a separate entry, Black's Law Dictionary defines the term "foreclosure" as "[a] legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property."

> Black's Law Dictionary defines "exchange" to mean "[t]he act of transferring interests, each in consideration for the other," and defines the related term "bargained-for-exchange" to mean "[a] benefit or detriment that the parties to a contract agree to as the price of performance."  As with the definition of a "sale," the hallmarks of these definitions include a voluntary transfer of interests between similarly situated parties.

52

> [O]ur courts arguably have not always viewed cases involving the interpretation of § 271 through a lens focused by the statute's plain words. Nonetheless, it remains a fundamental principle of Delaware law that the courts of this state should apply a statute in accordance with its plain meaning, as the words that our legislature has used to express its will are the best evidence of its intent. To analyze whether the vote requirement set forth in § 271 applies to a particular asset sale without anchoring that analysis to the statute's own words involves an unavoidable risk that normative preferences of the judiciary will replace those of the General Assembly.[179]

Accordingly, we clarify that there presently is no insolvency exception embedded in Section 271.

Because we have concluded that the Charter provision and Section 271 are materially different, we have not looked to Section 271 to interpret the Charter. And the parties have identified no public policy that would detract from our analysis of the Charter.[180] Rather, enforcing the unambiguous Charter provision is consistent with our

---

*Stream TV*, 250 A.3d at 1040 (alterations in original) (emphasis omitted). *See also In re E.T. Russell Co.*, 291 F. at 816 ("I am unable to extend the meaning of the word 'sale,' so that it will include an assignment for the benefit of creditors.").

[179] *Hollinger Inc.*, 858 A.2d at 376–77 (footnotes omitted).

[180] As we noted earlier, the Court of Chancery identified a single public policy concern, namely, "interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest." *Stream TV*, 250 A.3d at 1042. The court cited to then Vice-Chancellor Strine's transcript ruling in *Gunnerman v. Talisman Capital Talon Fund, Ltd.* where he observed that the DGCL distinguishes between financing transactions, mortgage transaction, collateral transactions, and sales of assets. *Id.* at 1043 (citing *Gunnerman v. Talisman Cap. Talon Fund, Ltd.*, C.A. No. 1894-VCS (Del. Ch. July 12, 2006) (TRANSCRIPT)). Following this reasoning, the court, in its P.I. Opinion, reasoned that interpreting Section 271 to require a stockholder vote before an insolvent or failing corporation can transfer its assets to secured creditors would conflict with Section 272 of the DGCL. *Id.* at 1021. We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271. Moreover, Section 272 is a default rule that corporations can alter in their charters, which Stream has done here.

policy of seeking to promote stability and predictability in our corporate laws,[181] and with recognition that Delaware is a contractarian state.[182]

## IV. CONCLUSION

For the reasons stated herein, we **VACATE** the injunction, **REVERSE** the declaratory judgment, and **REMAND** for further proceedings consistent with this opinion.

---

[181] *See Salzberg*, 227 A.3d at 137 ("The policies underlying the DGCL include certainty and predictability, uniformity, and prompt judicial resolution to corporate disputes.").

[182] *See NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 n.14 (2015) ("Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties." (quoting *NACCO Indus., Inc. v. Applican Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009))); *see also A & J Cap., Inc. v. L. Off. Of Krug*, 2018 WL 3471562, at *6 (Del. Ch. July 18, 2018) ("Delaware's pro-contractarian policy in the alternative entity space is alive and well.").